OPINION
{¶ 1} Joseph D. Stevenson was convicted after a jury trial in the Greene County Court of Common Pleas of receiving stolen property (a firearm) and complicity to robbery, both with firearm specifications. The court sentenced Stevenson to seventeen months in prison for receiving stolen property and seven years in prison for robbery, which were to be served *Page 2 
concurrently. The court further sentenced him to a mandatory one-year prison term for the firearm specifications, which were to be served concurrently to each other but consecutively to the aggregate seven-year sentence imposed for the offenses.
 {¶ 2} Stevenson appeals from his conviction. He claims that his conviction was against the manifest weight of the evidence, that the trial court should have granted a mistrial due to discovery violations, and that the prosecutor engaged in several instances of misconduct. For the following reasons, the judgment of the trial court will be AFFIRMED.
 I {¶ 3} The state's evidence at trial established the following facts.
 {¶ 4} In late March 2006, Joseph Stevenson (aka "Tiger") and Wayne Bailey traveled from Chicago, Illinois, to visit their friend, Tian Simmons, a student at Central State University. On March 26, 2006, Stevenson, Bailey, and Simmons went to 341 Stelton Road, apartment 17, the apartment of two brothers, Leonard and Anthony Hill, to visit with Javez Gathings, who lived there on-and-off Stevenson was Gathings' half-brother. The Hills knew Simmons from school but they were unfamiliar with Stevenson and Bailey. (Leonard and Gathings were students at Wilberforce; Anthony was a student at Central State University.) Although the Hills were also from Chicago, Stevenson, Bailey, and Simmons were from a different Chicago neighborhood.
 {¶ 5} While at the Hills' apartment, Leonard, Simmons, Bailey and Stevenson watched football and smoked marijuana. Leonard also spent time in his room studying, and Anthony went to a friend's house to play video games. At some point, Stevenson saw a picture of an SKS rifle belonging to the Hills, and he expressed interest in it. Anthony offered to sell the rifle *Page 3 
to Stevenson for approximately $650. However, Stevenson did not have enough money to buy it. Soon after, Anthony went back to a neighbor's apartment to play video games.
 {¶ 6} Stevenson remained interested in purchasing the rifle. Simmons later called Anthony and told him that Stevenson had more money and was ready to purchase the rifle. Simmons asked Anthony to bring the rifle to the apartment. Anthony retrieved the rifle and hid a .380 handgun under his sweater. Upon returning to the apartment, Stevenson indicated that he did not have enough money and tried to negotiate the price. Stevenson offered a .357 magnum plus $400, but Anthony declined. Bailey tried to walk out of the apartment with the rifle, but Leonard stopped him. The Hills heard Stevenson tell Bailey, "I want that gun." Anthony folded up the rifle, placed it in a blue bag and put it a corner of the apartment.
 {¶ 7} Anthony began to leave the apartment again; Stevenson, Bailey and Simmons followed him. After the men were in the hallway, Anthony came back into the apartment and shut the door. Anthony testified that he had "an uneasy feeling," and he and Leonard noticed that the other three men did not leave the apartment building.
 {¶ 8} Soon after, Bailey knocked on the door. When Leonard opened it, Bailey "forced himself in" and insisted that he had left "weed" in the couch. While Leonard began looking through the cushions, Bailey pulled out the .357 magnum and ordered the Hills onto the couch. While Bailey was screaming orders at the Hills, Stevenson came into the apartment, took the SKS rifle, and left. Bailey hit Leonard on the head with his gun. In response, Anthony shot at Bailey with his .380. Bailey returned fire, hitting Anthony. Leonard dove onto Bailey, and Bailey shot Leonard in the arm and stomach. The three fought until Bailey became unconscious. Leonard and Anthony both went to neighbors, who called 911. When Bailey regained *Page 4 
consciousness, he ran out of the apartment. Anthony chased him into the parking lot, where the two men fought again until they fell.
 {¶ 9} After emergency personnel arrived, Leonard was taken to Miami Valley Hospital, and Anthony was taken to Greene Memorial Hospital. Both survived their wounds. Bailey was taken to the hospital, where he died several days later.
 {¶ 10} Stevenson returned to Chicago the following day. He was arrested by Maywood (Illinois) police officers on April 7, 2006. According to Sergeants Dwayne Wheeler and Theodore Yancy, Stevenson told them that Bailey had suggested that they "just take the gun" and that Stevenson had rejected the idea. However, Bailey went back to the Hills' apartment. Stevenson stated to the officers that he went back to the apartment to "check on my boy" and saw Bailey pointing a gun at the Hills. Stevenson admitted that he then took the SKS rifle and later sold the rifle and ammunition in Bellwood, Illinois, for $1,200. Wheeler testified that he did not know the specifics of events in Xenia when he interviewed Stevenson, and Yancy likewise stated that he had not previously spoken with officers in Ohio about the robbery.
 {¶ 11} Stevenson presented four witnesses in his defense. John Giralamo, a former prosecutor and now criminal defense lawyer from the Chicago area who has represented Stevenson, testified that he responded to the Maywood police station on August 7, 2006. Giralamo stated that both Wheeler and Stevenson had told him that Stevenson had not made any oral or written statements. Giralamo expressed some concerns about Wheeler's truthfulness. Stevenson also called Paramedic Jeff Mallow of the Xenia Fire Department and Sergeant Peter Wiza of the Xenia Police Department. Mallow testified that he had treated Leonard at the scene and transported him to the hospital. Mallow described Leonard as conscious, oriented and alert. *Page 5 
Wiza stated that he had contact with Leonard and Anthony at the scene. Wiza testified that neither brother gave any indication that a rifle had been stolen or that Stevenson or "Tiger" had been involved in the offense. Leonard and Anthony both identified Bailey as the perpetrator. Wiza indicated, however, that he did not ask if a second person had been involved.
 {¶ 12} Finally, Stevenson testified on his own behalf. According to Stevenson, he came to Ohio to visit Simmons. On April 26, 2006, Stevenson, Simmons, and Bailey spent some time with Gathings, Stevenson's half-brother, at his (and the Hills') apartment. Stevenson saw a picture of the SKS rifle and asked Gathings about it. Gathings stated that it was his roommate's gun and that his roommate was trying to sell it. Stevenson testified that he did not have any interest in buying the gun, but Gathings called Anthony and asked him to bring the rifle to the apartment to show Stevenson. Gathings left the apartment before Anthony arrived. Once there, Anthony offered the rifle to Stevenson for $600 but Stevenson still had no interest in buying the weapon. Anthony then left, taking the rifle with him. Stevenson stated that he, Simmons, and Bailey left about five minutes later.
 {¶ 13} As they were leaving the building, Stevenson saw Anthony going up the stairs to his apartment. Stevenson, Simmons, and Bailey continued toward Simmons' apartment. When they were about ten feet onto the grass, Bailey stated that he had forgotten his marijuana and he went back alone to the Hills' apartment. Stevenson and Simmons continued to Simmons' apartment without Bailey. Approximately five minutes later, Stevenson and Simmons heard what they learned were gunshots. Gathings called Simmons, and Stevenson learned that Bailey had shot the Hill brothers and that Bailey had been shot. Simmons and Stevenson decided to go to the home of Simmons' girlfriend, and they left the area before the police arrived at the scene. *Page 6 
Although Stevenson called Bailey's family, he did not check on Bailey. Stevenson returned to Chicago the next day on a Greyhound bus. He denied that he had the rifle with him.
 {¶ 14} Stevenson testified that he was arrested by Maywood police officers, but he denied making any statements to the police. He also denied trying to contact Leonard in April 2007. On rebuttal, the state presented evidence that Stevenson's jail phone card was used to call Leonard Hill's cell phone number on April 24, 2007.
 {¶ 15} At the conclusion of the trial, Stevenson was convicted of receiving stolen property (a firearm) and complicity to robbery, both with firearm specifications. The trial court sentenced him accordingly.
 {¶ 16} Stevenson raises three assignments of error on appeal.
 II {¶ 17} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING FINDINGS OF GUILTY TO THE CHARGES OF COMPLICITY TO COMMIT AGGRAVATED ROBBERY AND RECEIVING STOLEN PROPERTY AGAINST APPELLANT WHICH FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 18} In his first assignment of error, Stevenson claims that his conviction was against the manifest weight of the evidence.
 {¶ 19} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice *Page 7 
that the conviction must be reversed and a new trial ordered."State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.Martin, 20 Ohio App.3d at 175.
 {¶ 20} Stevenson claims that the jury lost its way for several reasons. First, he claims that the testimony of the Hill brothers was not credible. He cites to evidence that Leonard had several small baggies of marijuana, which he claimed were for his personal use rather than for sale. He also argues that Anthony purchased the rifle without a background check or registration and he admitted during trial that he had lied to police about where his .380 had been hidden during the robbery. Stevenson notes that the Hills' statements that Stevenson came into the apartment and took the rifle are also suspect.
 {¶ 21} As stated above, "[a]n appellate court should not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." In re CM., Montgomery App. No. 21363, 2006-Ohio-3741, ¶ 41. That is not the case here. Although neither brother immediately informed the *Page 8 
Xenia police of Stevenson's involvement, both had been seriously injured with gunshot wounds and, when questioned at the scene, had focused on Bailey's involvement as the shooter. Although Stevenson argues that Leonard initially identified Simmons as the second perpetrator, Leonard denied making such a statement during his cross-examination by defense counsel. Despite the inconsistencies in the Hills' testimony, the jury could have reasonably credited the testimony of Leonard and Anthony.
 {¶ 22} Stevenson further argues that the evidence does not support the conclusion that he acted in complicity with Bailey. We disagree. According to Leonard's testimony, Stevenson treated Bailey "like a stooge," and Stevenson told Bailey "I want that gun" when Anthony did not agree to sell the rifle to Stevenson. Viewing the evidence as a whole, the jury could have reasonably viewed Bailey's return to the Hills' apartment — purportedly to look for his marijuana — as an orchestrated ruse to subdue the Hills so that Stevenson could retrieve the rifle from the apartment. As noted by Stevenson, "[a]t no point do the Hills claim that Wayne said anything about wanting anything from them."
 {¶ 23} Stevenson argues that "[s]cant weight, if any[,] should have been given to the testimony of Illinois Police Detective Wheeler." Stevenson notes that his alleged statement was not audiotaped or videotaped, and there are questions as to whether Stevenson waived hisMiranda rights. Stevenson implies that his alleged confession was fabricated.
 {¶ 24} Although Stevenson presented evidence that Wheeler was "gung-ho" and that his alleged statement was written by Wheeler, Wheeler's testimony was substantiated by Yancy, whose integrity was not challenged. Both officers testified that Stevenson had an opportunity to review his statement, as written by Wheeler, and that he did not make any changes to it. The *Page 9 
details in the statement corresponded significantly with the testimony of Leonard and Anthony. We note that both officers testified that they had no prior knowledge of the specifics of the events in Xenia, and there is no evidence to the contrary. In light of the details included in Stevenson's alleged statement to the officers and the officers' lack of prior knowledge of those details, the jury could have reasonably credited Wheeler's testimony that Stevenson had voluntarily given a detailed statement to the officers.
 {¶ 25} Finally, Stevenson asserts that the jury should have credited his version of the events. In many respects, Stevenson's version is consistent with that of the Hills. However, Stevenson presented no evidence to substantiate that he did not reenter the Hills' apartment. Moreover, the state presented strong evidence that Stevenson had tried to contact Leonard from jail in April 2007, which Stevenson had denied. We cannot conclude that the jurors lost their way when they chose not to believe Stevenson's version of the events of April 26, 2006.
 {¶ 26} The first assignment of error is overruled.
 III {¶ 27} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO GRANT A MISTRIAL IN THE INSTANT CASE WHEN THE STATE VIOLATED FUNDAMENTAL FAIRNESS IN THE DISCOVERY PROCESS AND INTRODUCED IMPROPER TESTIMONY."
 {¶ 28} In his second assignment of error, Stevenson claims that the trial court should have granted a mistrial due to the prosecutor's failure to provide discovery and Sergeant Wheeler's testimony that Stevenson was being sought on other criminal charges.
 {¶ 29} Beginning with the discovery matter, Stevenson argues that the prosecutor *Page 10 
improperly withheld tape recorded statements of Leonard and Anthony Hill. Although Stevenson acknowledges that Crim. R. 16 may not have required the prosecutor to produce the tapes and statements, he argues that the prosecutor had promised to provide them and was obligated to honor that agreement.
 {¶ 30} Prior to Leonard and Anthony's testimony, defense counsel objected to the prosecutor's use of their testimony, citing the prosecutor's alleged failure to provide the Hills' recorded statements, their current addresses, and whether Anthony had a prior felony record. With respect to the recorded statements, the court overruled the objection, reasoning that the statements of witnesses were not subject to disclosure prior to trial under Crim. R. 16. Defense counsel reserved the right to present evidence that the prosecutor had nevertheless agreed to the provide the recorded statements. Following the discussion, the state called Leonard Hill as a witness. Before court concluded for the day, defense counsel began his cross-examination of Leonard.
 {¶ 31} At the beginning of the second day of trial, defense counsel presented copies of two letters that he had sent to the prosecutor, which had requested copies of the tape recorded statements. Although the prosecutor denied agreeing to send copies of the recordings to defense counsel, the prosecutor acknowledged that he had received defense counsel's requests for those tapes. Defense counsel argued that, irrespective of Crim. R. 16, the prosecutor had agreed to provide the taped statements prior to trial yet had failed to do so. Defense counsel further stated that Stevenson had a right to an in camera inspection of those statements pursuant to Crim. R. 16(B)(1)(g). The prosecutor responded that he had not received blank CDs on which to make recordings for defense counsel and that he had provided summaries of the taped witness *Page 11 
statements.
 {¶ 32} The court overruled defense counsel's objections, again ruling that Crim. R. 16 did not require the prosecutor to provide the witness statements to defense counsel but that Crim. R. 16 authorized, upon request, an in camera inspection of the recorded statements after the witness had testified. At this juncture, defense counsel continued his cross-examination of Leonard. Defense counsel did not request an in camera inspection of Leonard's taped witness statement, nor did he request an in camera inspection of Anthony's taped witness statement after his direct testimony.
 {¶ 33} On appeal, Stevenson argues that the "defense depended upon the State to either honor its agreement and produce the evidence or not to use it, i.e., the Hills' testimony at trial. If defense counsel had been aware that he would not have received promised discovery and that said evidence would be presented by the State, he may have take[n] a different trial strategy or attempted to have investigators appointed to independently gather information."
 {¶ 34} We find no reversible error in the trial court's rulings. Under Crim. R. 16(B)(1)(e), the prosecutor is required to furnish a written list of the names and addresses of all witnesses that the prosecutor intends to call at trial, along with any record of felony convictions of any such witnesses. The prosecutor is not required to provide witness statements prior to trial. Although Crim. R. 16(B)(1)(g) authorizes in camera inspection of witness statements upon the completion of the witness's direct examination, Stevenson did not ask the trial court to conduct an in camera inspection of Leonard's taped witness statement prior to resuming cross-examination nor did he request an in camera inspection of Anthony's taped witness statement following his direct testimony. *Page 12 
 {¶ 35} The crux of Stevenson's argument is that the state agreed to provide the statements, Crim. R. 16 notwithstanding. The parties blame each other for copies not being made. Regardless, Stevenson received summaries of the witness statements, and there is no evidence in the record that these summaries were incomplete or misleading. ContrastState v. Roughton (1999), 132 Ohio App.3d 268, 285, 724 N.E.2d 1193
(noting that "once the state agreed, through stipulation, to provide appellant with the summary [of an inmate witness's statement], it had an obligation to provide a complete summary.") Based on the record, there is no evidence that Stevenson was prejudiced by the state's alleged failure to provide copies of the taped statements.
 {¶ 36} Stevenson also complains that he was denied due process by Wheeler's testimony that he had informed his gang team that the Bellwood police were looking for Stevenson for an incident that happened in Ohio "and also for an incident we were looking for." Stevenson states that Wheeler's testimony improperly informed the jury that he was a suspect in a crime in Illinois, thus creating the inference that he was more likely guilty in this case. Stevenson, however, did not object to Wheeler's testimony.
 {¶ 37} Upon review of the record, Wheeler did not elaborate about the other "incident," and the state did not emphasize this testimony. Moreover, Stevenson presented evidence that he has retained Donna Rotunno and her partner, John Giralamo, for criminal matters, that he calls them by their first names, and that he has Rotunno's telephone number in his cell phone. Stevenson acknowledged that he had two felony convictions for possession of firearms. We find no basis to conclude that Wheeler's testimony that officers in the Chicago area were looking for Stevenson for an unrelated matter had any impact on the outcome of the trial.
 {¶ 38} Stevenson further asserts that the cumulative effect of the state's failure to *Page 13 
provide promised discovery and Wheeler's "other acts" testimony warrants reversal of his conviction. Although the Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction, State v. DeMarco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus, we do not find that prejudicial error exists in this case.
 {¶ 39} The second assignment of error is overruled.
 IV {¶ 40} "PROSECUTORIAL MISCONDUCT IN FAILING TO PROVIDE PROMISED DISCOVERY AS WELL AS IMPROPER ARGUMENT SERVED TO DENY APPELLANT DUE PROCESS AND TO VITIATE THE INSTANT CONVICTION."
 {¶ 41} In his third assignment of error, Stevenson claims that the prosecutor engaged in misconduct during his examination of witnesses and in his closing argument. Stevenson cites to the following statements by the prosecutor: (1) asking Stevenson during cross-examination whether Stevenson "knew what perjury is"; (2) asking Leonard on re-direct examination "you know what they are trying to get to were you intoxicated to the point where you couldn't. You know why their [sic] asking the question"; (3) commenting that Officer Wheeler "did an A-one job"; (4) describing Attorney Giralamo as "representing drug dealers" and "drug and violent people"; (5) asking rhetorically during rebuttal closing argument whether "Mrs. Bailey thinks this is a fairy tale?"; and (6) stating during rebuttal closing argument that he "didn't believe in illegal drug use" nor was he a "gun person." None of Stevenson's claims has merit.
 {¶ 42} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *Page 14 State v. Jones (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300, citingState v. Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v.Loza (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. Darden v. Wainwright (1986),477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.
 {¶ 43} First, Stevenson complains that the prosecutor asked him if he understood what perjury was during his cross-examination. The prosecutor had asked Stevenson why he had tried to call Leonard, and Stevenson had responded that he "never tried to call Leonard Hill." On rebuttal, the state subsequently presented the testimony of Captain Robert Walton of the Greene County Sheriffs Office, who testified that the Greene County Jail recording system indicated that Stevenson's phone card was used to make a 1 minute, nine second telephone call to Leonard's cell phone at 9:28 p.m. on April 24, 2007. There was no evidence that anyone other than Stevenson had used the phone card.
 {¶ 44} We agree with Stevenson that it is ordinarily improper for a prosecutor to remind a witness of perjury, because it expresses the prosecutor's belief that the witness is not credible. State v.Kerr, Cuyahoga App. No. 80272, 2002-Ohio-4190, at ¶ 64. However, the state's reminder of perjury was followed by rebuttal evidence that directly contradicted Stevenson's statement that he had not called Leonard. Viewing the trial as a whole, the state's reminder of *Page 15 
perjury did not deprive Stevenson of a fair trial.
 {¶ 45} Second, Stevenson claims that the prosecutor gave his opinion on the veracity of the witness during follow-up questioning of Leonard. Following counsel's questioning of Leonard, the jury was permitted to submit questions. The trial court read one jury question as: "The question is how much beer and weed that day, I assume how much was consumed by those at the apartment, how much beer and weed that day?" Leonard responded that he did not consume "that much because I was still trying to focus on my studies."
 {¶ 46} During the prosecutor's follow-up questions, the following exchange occurred:
 {¶ 47} Prosecutor: "Leonard, the Jury asked a question, one of [the] Jurors asked a question, a good question, regarding the alcohol. First of all, were you drinking beer that day?"
 {¶ 48} Leonard: "That's correct."
 {¶ 49} Prosecutor: "I think what the Jury wants to know [is] how much beer; did you have 12 bottles? How much?"
 {¶ 50} Leonard: "I think it was about a 6 or 12 pack. I think it was a 12 pack. Yes, sir."
 {¶ 51} Prosecutor: How much did you drink is what I'm asking."
 {¶ 52} Leonard: "I maybe drank about two beers."
 {¶ 53} Prosecutor: "Two beers?"
 {¶ 54} Leonard: "Yes."
 {¶ 55} Prosecutor. "Okay. And you are studying at the same time?"
 {¶ 56} Leonard: "That's correct."
 {¶ 57} Prosecutor: "And how much marijuana were you smoking? You know, what they're trying to get to is were you intoxicated to the point where you couldn't — what was your *Page 16 
state of sobriety?"
 {¶ 58} Leonard: "I was still fully functional. I was still fully functional. I may have smoked one joint and that's about it until the incident occurred. And that's about it. I hadn't smoked that much at all that day at all."
 {¶ 59} Prosecutor: "You were studying that day?"
 {¶ 60} Leonard: "That's correct."
 {¶ 61} Prosecutor: "Okay. All right. You understand why they're asking that question?"
 {¶ 62} Leonard: "Yes, I understand."
 {¶ 63} Reviewing the entire exchange, we find no basis to conclude that the prosecutor was improperly bolstering the credibility of his witness or providing his own opinion on the witness's veracity. We see no misconduct in the prosecutor's questioning of Leonard following the jury's questions.
 {¶ 64} Stevenson claims that the prosecutor made four improper statements during closing arguments. Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument.State v. Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81, 667 N.E.2d 369;State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom."State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quotingState v. Stephens (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been *Page 17 
prejudiced." Stevens, supra, citing Ballew, supra, and State v.Lorraine (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.
 {¶ 65} Stevenson challenges the prosecutor's statement during closing argument that Attorney John Giralamo represented "drug dealers," "violent people," and "gang people." Giralamo is a former prosecutor and is now a criminal defense and traffic attorney. During cross-examination, he acknowledged that he is a private attorney who represents individuals involved in drugs and gangs. Giralamo stated that a majority of his business was representing drug dealers. Considering Giralamo's testimony, the prosecutor's statements during closing argument were proper comment on the testimony.
 {¶ 66} Stevenson further argues that the prosecutor improperly commented that Officer Wheeler "did an A-one job." That portion of the prosecutor's closing argument addressed Giralamo's testimony that, while Giralamo was a prosecutor, "the facts that were presented to me [by Wheeler] I didn't believe were truthful enough to actually file criminal charges against the individual." Giralamo characterized Wheeler as "gung-ho." However, on cross-examination, Giralamo was unable to give specific examples of cases where Wheeler had been untruthful. During closing argument, the prosecutor commented on that evidence, without objection, stating:
 {¶ 67} "* * * I want you to ask yourselves when you, when you start hearing in closing by opposing counsel Sergeant Wheeler being bad mouthed, ask yourself, ask yourself, how come this smart attorney, private attorney, good attorney [Giralamo] I assume representing a lot of drug dealers, majority, that is his practice, how come he could not come up with one example. If someone is going to say you, you, you, you, are some bad person, or you lack the veracity, I *Page 18 
bet you're going to say well give me an example of my lack of veracity when I was untruthful, if they're going to say that to you. Ask yourself how come that man, when I asked him, he wilted. He could not come up with one answer. He couldn't back in the interview [prior to trial], and he had a lot of time to think about it. And he still couldn't.
 {¶ 68} "The only thing he could say well I gave it to my supervisor. Then I don't know who the Juror was but someone had an excellent question. If you thought this sergeant was so horrible, was so bad he lacked veracity, why didn't you report it to somebody? Why didn't you report it to somebody? I think the answer is because the same reason why he could not come up with — Ladies and Gentlemen, I'm going to tell you you, when you can't come up with just one example, Sergeant Wheeler must be an awful good officer. I know in this job he did an A-one job. But he must be awful good if this man cannot come up with months to prepare one example. One. Which he could not. He could not. * * *"
 {¶ 69} Although the prosecutor may not comment on the credibility of a witness, the prosecutor's comment did not affect the validity of the trial. Read in context, the prosecutor's comments focused on Attorney Giralamo's inability to substantiate the allegation that Wheeler was not a good officer. Moreover, the state had presented evidence that Wheeler obtained a statement from Stevenson about the events in Xenia without any knowledge of what had occurred on March 26, 2006. Accordingly, the prosecutor's comment that Wheeler had performed his duties well in this case was based on the evidence at trial.
 {¶ 70} Next, Stevenson argues that the prosecutor acted improperly when he stated during rebuttal closing argument, "Do you think Mrs. Bailey [Wayne Bailey's mother] thinks that is a fairy tale? This is real life." In so stating, the state was responding to defense counsel's *Page 19 
equating of this case to the Emperor's New Clothes. Specifically, defense counsel had stated: "Do the right thing in this case. Do the right thing. Do what the little girl did in that story. The Emperor's New Clothes, expose the Emperor for what it is, a fairy tail [sic]. Not guilty." As argued by the state, the prosecutor's statements were not an attempt to appeal to the jurors' sympathies. Rather, the statements were an attempt to counter defense counsel's reference to the state's case as a "fairy tale."
 {¶ 71} Lastly, Stevenson challenges the prosecutor's statement in his rebuttal closing argument that he did not believe in illegal drug use nor was he a "gun person." The prosecutor stated, without objection:
 {¶ 72} "* * * I'll close by saying one thing, and that is a lot has been said about Anthony Hill and him having this gun, and whatever. I'm not one that advocates illegal drug use. I don't believe in it. I happen to be against it, or whatever. That is wrong. And I'm not a gun person. But I will say this. Ask yourself right now if Anthony Hill hadn't had that .380 — by
 {¶ 73} the way, he testified it was under his jacket — if he hadn't had that .380, what do you think would have happened to him? What do you think Wayne Bailey, along with the Defendant, would have done to them that day? * * *"
 {¶ 74} Reviewing the record as a whole, we find no basis to conclude that the prosecutor's statements of his views on guns and drugs affected the outcome of the trial. Moreover, the statements were in response to defense counsel's suggestion that Anthony was involved in drug dealing, collected guns, and had obtained the rifle illegally.
 {¶ 75} The third assignment of error is overruled.
 V *Page 20 {¶ 76} Having overruled each of the assignments of error, the judgment of the trial court will be AFFIRMED.
BROGAN, J. and DONOVAN, J., concur
Copies mailed to:
Elizabeth A. Ellis
J. Allen Wilmes
 Hon. J. Timothy Campbell *Page 1