[Cite as *State v. Miller*, 2018-Ohio-3433.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 9-18-02

    v.

JACQUELINE R. MILLER,               O P I N I O N

    DEFENDANT-APPELLANT.


**Appeal from Marion County Common Pleas Court**
**Trial Court No. 17-CR-249**

**Judgment Affirmed**

**Date of Decision:   August 27, 2018**


APPEARANCES:

    *Nathan Witkin* **for Appellant**

    *Kevin P. Collins* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Jacqueline R. Miller ("Miller"), brings this appeal from the December 21, 2017, judgment of the Marion County Common Pleas Court sentencing her to 15 years to life in prison after Miller was convicted in a jury trial of Murder in violation of R.C. 2903.02(A), an unclassified felony, and Possession of Cocaine in violation of R.C. 2925.11(A), a felony of the fifth degree. On appeal, Miller argues that her conviction for Murder was against the manifest weight of the evidence, that the trial court should have declared a mistrial based on prosecutorial misconduct, and that she received ineffective assistance of trial counsel.

*Relevant Facts and Procedural History*

{¶2} On June 14, 2017, Miller was indicted for one count of Murder in violation of R.C. 2903.02(A), an unclassified felony, and one count of Possession of Cocaine in violation of R.C. 2925.11(A)/(C)(4), a felony of the fifth degree. It was alleged that Miller beat 81-year old Howard Biederman to death with a pair of vise grips, striking him at least 18 times, including 14 times in the head.

{¶3} Howard lived several houses down from Miller and had loaned her money in the past. Miller was living in a tent behind her old house at the time of the incident because her water and electric had been shut off. Miller was a crack-cocaine user, and allegedly went to purchase crack after beating Howard to death,

and taking $20 out of his shirt pocket. When she was located later on the evening of Howard's death, she was found in possession of crack cocaine.

**{¶4}** Miller pled not guilty to the charges and her case proceeded to a jury trial, which was held December 12-15, 2017. The State presented the testimony of a dozen witnesses, introduced various stipulations regarding forensic evidence, and entered numerous exhibits. Miller then took the stand on her own behalf, and testified that Howard had actually made a sexual advance on her, indicating that she could "pay him back" money that he had loaned her through other means, which she took to be sexual. Miller testified that she then flashed-back to other incidents wherein she had been raped in her youth, and she struck Miller with vise grips that were nearby on a table. Miller claimed she only recalled striking Howard approximately 3 times, but the evidence indicated, conservatively, 18 separate strikes, including defensive wounds on Howard's arms. Miller also presented the testimony of a psychologist, who diagnosed her with PTSD.

**{¶5}** The jury was instructed on Murder, the lesser-included offense of Voluntary Manslaughter, and the lesser-included offense of Reckless Homicide. The jury was also instructed on self-defense. Ultimately, the jury returned guilty verdicts on the original Murder charge and the Possession of Cocaine charge as indicted.

{¶6} On December 21, 2017, Miller's case proceeded to sentencing. She was ordered to serve 15 years to life in prison on the Murder charge, and a concurrent 9-month prison term on the Possession of Cocaine charge. It is from this judgment that Miller appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Defendant-appellant's conviction of Murder was against the manifest weight of the evidence.**

**Assignment of Error No. 2**
**The court should have declared a mistrial based on prosecutorial misconduct.**

**Assignment of Error No. 3**
**Counsel for the defense provided ineffective assistance of counsel.**

*First Assignment of Error*

{¶7} In her first assignment of error, Miller argues that her conviction for Murder was against the manifest weight of the evidence.[1] Specifically, she contends that the jury's determination that Miller had the "purpose" to commit murder was against the manifest weight of the evidence. She also argues that the jury's failure to find self-defense in this case was against the manifest weight of the evidence.

Standard of Review

{¶8} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting

---

[1] Miller makes no argument with regard to her conviction for Possession of Cocaine, and does not mention it in the assignment of error, therefore we will not address it. She seemed to largely concede the possession charge at trial.

testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*. Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required. *Thompkins* at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

Relevant Authority

{¶9} In this case, Miller was convicted of Murder in violation of R.C. 2903.02(A), which reads, "No person shall purposely cause the death of another[.]"

{¶10} Miller claims that the jury's finding that she had the specific purpose to kill Howard was against the manifest weight of the evidence. Purpose is defined in R.C. 2901.22 as follows.

> **A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.**

{¶11} Purpose can be established by circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). "The element of purpose required by R.C. 2903.02 may be presumed where the natural and probable consequences of a wrongful act are to produce death. *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist. 1994), citing *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517 (1954), paragraph five of the syllabus.

{¶12} Miller also claimed self-defense in this case, and she argues that the jury's failure to find self-defense was against the manifest weight of the evidence. In order to establish self-defense, the defendant must establish that

> **(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that [she] was in imminent danger of death or great bodily harm and that [her] only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger.**

(Internal citations omitted). *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979). If the *defendant* fails to prove *any* of the elements of self-defense by a preponderance of the evidence, she has failed to demonstrate that she acted in self-defense. *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

## Evidence Presented

{¶13} At trial, the State presented evidence that the victim, Howard Biederman, was 81 years old and that he lived alone at 303 Uncapher Street in Marion, Ohio. According to Howard's daughter-in-law, Karla Biederman, Howard

had colon cancer, had recently had surgery for it, and was still recovering on June 7, 2017. Karla and/or her husband went to Howard's home daily to check on him and take him leftovers to eat.

{¶14} Karla indicated that Howard was a creature of habit, that he always sat in the same chair, that he kept his house *very* warm and that he would often sit with his shirt off. Karla testified that when Howard was wearing a shirt at home, it was always a button-up shirt with a front pocket, and he kept his money in that front pocket. Karla testified that at one point Howard had cashed his son's social security check and had around $1,000 on him.

{¶15} Karla testified that Howard had mentioned Miller to her before, indicating that Miller had borrowed money from him but had not paid any of it back. Karla testified that in the weeks prior to Howard's June 7, 2017, death, Howard had said he was "fixing to cut [Miller] off because she won't pay me back." (Tr. at 218).

{¶16} Miller lived at 327 Uncapher Street, a few houses down from Howard, but her electric and water had been turned off so she was staying in a tent behind the residence. On June 7, 2017, Miller was seen going to Howard's residence by Rhonda Bollinger, who lived across the street from Howard, at approximately 4:00 p.m. Bollinger saw Miller enter Howard's residence, but she did not see her leave.

{¶17} Karla Biederman testified that she went over to Howard's residence near 7:00 p.m. to check on him because he was not answering his phone. Karla had

dropped off new medications for cholesterol and blood pressure earlier in the day, and she wanted to make sure Howard knew how to take them. Karla testified that since Howard was not answering his phone, she went to his residence. She testified that when she walked in the front door, she saw Howard sitting in the chair he usually sat in, covered in blood, and she called 911.

{¶18} Police and firefighters responded, and Howard was pronounced dead at the scene. An autopsy revealed that Howard was approximately 5'6" and weighed 117 pounds. Dr. John Daniels of the Franklin County Coroner's Office testified that Howard died of blunt force injuries to the head.

{¶19} Dr. Daniels testified that, estimating conservatively, Howard had been struck 17 to 18 times, including at least 14 times in the head. At least one of the injuries depressed Howard's skull a quarter-inch. A number of lacerations were present to Howard's head ranging from three-quarters of an inch in length to a quarter-inch in depth. Dr. Daniels testified that the lacerations on Howard were consistent in size with each other, but he did not know what caused the blunt force damage. He did indicate, however, that he felt some of the wounds on Howard's extremities were defensive, and that the blow to the skull that caused a rectangular fracture would have led to unconsciousness fairly quickly, from instantaneously to a minute later.

{¶20} Howard was covered in blood when he was found on June 7, 2017. A piece of his skull was located on the floor and his blood was on the, floor, walls, and ceiling of his residence. After speaking with Karla and Rhonda, police identified Miller as a person of interest and sought to track her down. Miller was located later that evening at the home of Troy Gallagher.

{¶21} Gallagher testified that prior to the police arriving at his residence Miller had been there for 45 minutes to an hour. Gallagher testified that Miller had some blood on her, and that she had said that she thought she killed someone. Gallagher testified that he did not ask her more about that statement.

{¶22} Gallagher testified that Miller brought crack-cocaine with her to his residence in 3 bags, totaling potentially as much as $180 worth.[2] Gallagher testified that they smoked "a $20 piece" at his residence. Gallagher indicated that when the police knocked on his door, Miller told him to tell the police that she was not present. However, Gallagher allowed the police into his residence.

{¶23} Body camera footage of police entering Gallagher's residence was introduced into evidence. When the police entered Gallagher's room, Miller was present with multiple $20 bills and baggies that were later determined to contain crack cocaine. Miller could be seen on the body camera being concerned about

---

[2] Gallagher testified that Miller had brought three bags with her, one with approximately $40 of crack, one with approximately $60 of crack, and one with approximately $80.

retrieving her money at the time, which was on the floor. Miller was arrested and taken for questioning.

{¶24} An interview with Miller was played for the jury in its entirety. At the beginning of the interview, Miller noted that she had been at Howard's house earlier that day, thinking it was around 2 p.m., but she stated that nothing had happened there. During the interview the detective noted that Miller had what appeared to be blood on her clothes, on multiple layers, including her shoes. Blood on the outer shirt was later tested and found to be consistent with Howard's DNA.

{¶25} Miller accounted for her whereabouts after leaving Howard's by indicating that she had gone to purchase crack cocaine, that she went to a Family Dollar store and purchased cat food and laundry detergent, and that she then went to Troy's.

{¶26} Much later in the interview, Miller admitted to killing Howard, indicating that she used a pair of vise grips that were on Howard's table. When the detectives pressed her for a reason as to why she killed Howard, asking if Howard hurt her, or if Howard did something to her, Miller told the detectives that she had been raped multiple times previously when she was younger, and that Howard made a sexual advance on her, by putting his hand on her leg and indicating there were other ways she could pay him back money that she owed him.

{¶27} Miller indicated in the interview that she wiped the blood off the vise grips on her shirt before she left Howard's residence, and that she only remembered striking him a few times. The vise grips were located at Howard's residence on the table. They had DNA consistent with Howard's on them, but no blood, and no DNA consistent with Miller's.

{¶28} At trial, Miller testified in her own defense, elaborating on the issues that were discussed in her interview. She detailed three separate instances of rape that had purportedly occurred to her in her youth, the first by a family friend when she was 13. Miller testified that her parents did not want to ruin the man's family or reputation, so nothing was done about it.

{¶29} Miller testified that the second incident happened when she was 15. She indicated that two guys in a van pulled up and grabbed her, forced her to perform oral sex on them both for 2-3 hours. Miller indicated that she did not know the men, that they looked "like hippies," and that she never told anyone about the second incident.

{¶30} Miller testified that the third incident occurred a few months before her 17th birthday, when 4-5 guys pulled up in a car, grabbed her and took her to an abandoned garage. Miller stated that she was sexually assaulted by all of them, and sodomized, and that it lasted 4 to 5 hours. Miller testified that she did not know any

of them, but the guys seemed to know her family, and threatened to hurt them if Miller told anyone.

**{¶31}** As to her relationship with Howard, Miller testified that she had known Howard since she was young, and that she thought of him like a father figure. She testified that she had borrowed money from him in the past, but often tried to work it off by cleaning his dishes or his basement.

**{¶32}** Miller testified that on June 7, 2017, she got a letter about taxes that indicated she needed to call and she did not have a working phone so she went to Howard's residence to use his. Miller testified that she chatted with Howard and Howard stated at one point that he would give her $20. Miller testified that eventually Howard got up and sat by her on the couch, put his hand on her thigh and said that there were other ways she could pay him back.

**{¶33}** Miller testified that Howard's hand was close to her crotch and that he was grabbing her breasts, that he twisted her shirt and tried to pull her. Miller testified that she started recalling the prior sexual assaults, and when she could not get loose she picked up a tool on the table and hit Howard in the head with it 2 or 3 times to get away. Miller testified that she did not remember the incident well, and that Howard was still moaning on the floor when she wiped the tool off on her shirt. Miller testified that she took $20 out of Howard's shirt pocket before she left, because he had said she could have it.

{¶34} Miller testified that she did then go to purchase crack, that she also purchased laundry detergent at Family Dollar, and that she did go to Troy Gallagher's residence. Miller denied telling Troy that she thought she had killed someone earlier that day.

{¶35} Miller also presented the testimony of Dr. James Reardon, a psychologist and expert in forensic psychology. Dr. Reardon testified that he evaluated Miller, that he conducted multiple tests on her, and that he ultimately diagnosed Miller with moderate to severe PTSD.

Analysis

{¶36} On appeal, Miller argues that her conviction for Murder was against the manifest weight of the evidence. She first claims that the jury clearly lost its way by finding that Miller acted with the "purpose" to cause Howard's death.

{¶37} Contrary to Miller's argument, the jury was presented with testimony that Howard was struck with a pair of vise grips, conservatively, 18 times, 14 of those times in the head. The jury was shown pictures of how Howard was found, and of his various wounds. The numerous wounds were explained by the coroner who conducted the autopsy.

{¶38} The Supreme Court of Ohio has held that "[t]he severe, protracted nature of [a] beating [can indicate] the purpose to kill." *State v. Phillips*, 74 Ohio St.3d 72, 82, 1995-Ohio-171. Here, the sheer amount of blows to Howard's head

could certainly be circumstantial evidence of a purpose to kill, particularly given Howard's age and relative size. The corner described how one of the blows caved-in a portion of Howard's skull. Blood was all over Howard, in various parts of the room, including the ceiling, and on Miller's clothing. These facts are all indicative of a severe beating, especially given that the beating was executed with a metal tool.

{¶39} Moreover, although Miller claims that Howard was alive and moaning as she was leaving, even if we assumed that was true, she left him in a horrid state and did not call the police. This makes her version far less credible, and the jury was free to disbelieve her testimony.

{¶40} Given the brutal nature of the injuries here, we cannot find that the jury clearly lost its way in finding that Miller acted with the requisite mental culpability in this case. Therefore, her argument related to the jury's determination of "purpose" is not well-taken.

{¶41} Miller next argues that the jury erred by failing to find that she acted in self-defense even though the jury was instructed on self-defense. Notably, Miller's self-defense claim rested essentially entirely on her own self-serving testimony. The jury was able to hear her initial interview with the police, and her testimony in the courtroom and evaluate her version of events. The jury could have found that Miller's version of events was not credible.

**{¶42}** Similarly, the jury could have found that Miller failed to establish any of the elements of self-defense by a preponderance of the evidence. The jury could have concluded that Miller did not have a bona fide belief that she was in imminent danger of death or great bodily harm *or* the jury could have determined that Miller could have successfully retreated rather than resorting to deadly force. Again, the severe nature of the beating would support a finding that Miller violated a duty to retreat. Regardless, a finding regarding either one of these elements of self-defense would negate finding self-defense, and the evidence could support the jury determining not to find self-defense based on either of those two elements.

**{¶43}** Moreover, if evidence is susceptible to more than one construction, a reviewing court is bound to give it the interpretation consistent with the verdict and judgment. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, quoting *Seasons Coal Co.*, *Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d Appellate Review, Section 60, at 191-192 (1978); *see also State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015-Ohio-3113, ¶ 44. Given our standard of review, we cannot find that the jury clearly lost its way on the self-defense issue.

**{¶44}** After reviewing the trial transcript and all of the submitted exhibits, we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice in this case. Therefore, Miller's first assignment of error is overruled.

*Second Assignment of Error*

**{¶45}** In Miller's second assignment of error she argues that the trial court erred by failing to declare a mistrial based on prosecutorial misconduct. Specifically, Miller argues that the prosecutor improperly showed a gruesome photograph to the jury that had not been introduced into evidence, and that the State made improper statements in closing arguments.

Standard of Review

**{¶46}** Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and her conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by

the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

**{¶47}** Furthermore, as to prosecutorial misconduct allegations related to closing arguments, "[p]arties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.' " *State v. Wolff*, 7th Dist. Mahoning No. 07MA166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 213. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 116.

Alleged Impropriety During Trial

**{¶48}** Miller contends that the prosecutor committed misconduct by "violating" a motion *in limine* regarding the publication of certain photographic evidence to the jury. Miller's claim refers to an incident that apparently occurred while Lieutenant Chris Adkins of the Marion Police Department was testifying on the third day of the trial. During the testimony, defense counsel asked to approach the bench for a sidebar and the following discussion was held.

> **[DEFENSE COUNSEL]: I'm going to ask for a mistrial.**
>
> **THE COURT: Let's let everybody get up here.**
>
> **[DEFENSE COUNSEL]: I want to note for the record, I'm going to request a mistrial.**

**Mr. Grogan [the prosecutor]** – a photograph taken by the coroner, hasn't even been introduced into evidence, he picked that photograph that shows a very gruesome depiction of the brain cavity of the decedent. It was visible, plain and visible. I think it warrants a mistrial, Judge. That hasn't been introduced into evidence yet.

**THE COURT:** I mean, he's apparently working with the exhibits over there. I'm not sure they've been labeled. They were supposed to be labeled a week ago, before the pretrial last Tuesday.

**[DEFENSE COUNSEL]:** I mean, if I could see it –

**THE COURT:** I didn't observe that.

**[DEFENSE COUNSEL]:** I do want to –

**THE COURT:** You know, I'm not going to grant the mistrial at this point.

**[DEFENSE COUNSEL]:** Okay. I want to note for the record, I would ask that the Court – ask the State to very kindly – they should have organized their exhibits beforehand.

**THE COURT:** Sure.

**[DEFENSE COUNSEL]:** So if they can be very careful, be sensitive, I'd—

**THE COURT:** When you're handling those exhibits, Mr. –

**[PROSECUTOR]:** I'm being very careful.

**THE COURT:** [Defense Counsel] indicates that the picture of the brain cavity, which is one that's highly unlikely to get into evidence, as you're making it is visible to the jury. I did not observe that myself. What I'm suggesting is, let's be careful as

**we're handling those.  In fact, it probably wouldn't be bad to just put them in the folder.**

**[PROSECUTOR]:  They were upside down.  How are you going to accuse me of –**

**[DEFENSE COUNSEL]:  Okay.  You smirked as I noted my objection and as I was making my way up to the bench to address my concern.  That, I observed as well.**

**THE COURT:  I didn't—I didn't observe it.  I don't know, you know, that it has – I don't think there was any intentional effort to do that, but I didn't observe it happen either.  Just –**

**[PROSECUTOR]:  Just to defend myself, I – there was a couple of things.  Yes, I marked a couple of pictures.  I have made very careful consideration not to show them to the jury.  I'm the one who suggested they not be published to the jury.**

**So to stand there and have you say, [Defense Counsel], of all people, that I am doing something to pass – to the jury, in my – we can talk about that later.  But that is highly improper.  I absolutely did not publish anything to the jury.**

**[DEFENSE COUNSEL]:  I didn't say you published it.**

**[PROSECUTOR]:  You said, "Let me see it."**

**[DEFENSE COUNSEL]:  You're not – you're being –**

**THE COURT:  Okay.  I think I've got everybody's position.**

**DEFENSE COUNSEL]:  Yes.**

**THE COURT.  I denied your request for a mistrial.  I've asked the prosecutor to keep them out of the presence of the jury.  So let's proceed.  Okay.**

(Tr. at 511-514).

{¶49} Miller argues that the preceding incident established that the State had improperly shown a gruesome photograph to the jury.

{¶50} Miller argues that the State acted improperly *again* regarding photographs while Dr. Reardon was on the stand for the defense. During Dr. Reardon's testimony, defense counsel asked to approach the bench for a sidebar and he indicated that a "photograph" was "sticking up" from the prosecutor's files. (Tr. at 852). It is not clear what the photograph was or how visible it was to the jury, but it was promptly covered at the direction of the trial court.

{¶51} Miller contends that the State had been prevented from introducing a number of photographs at trial that were determined to be too gruesome and thus the prosecutor was potentially subverting the trial court's ruling to limit the amount of gruesome photographs to the jury by letting them by seen from counsel table.

{¶52} However, we would note that shortly after the initial incident, the prosecutor stated that he was not opposed to a jury instruction indicating that if the jury saw any photographs at counsel table, they were not evidence. The jury was specifically instructed in closing arguments that if it observed documents, photographs or other items at counsel table, they were not evidence and "must be disregarded." (Tr. at 861).

{¶53} In addition, defense counsel later stated, regarding the incident, "I want to comment for the record, first, I wasn't saying that you submitted the exhibit

or any misconduct, but kind of like the cards in Texas hold 'em, you protect your cards. You don't show them." (Tr. at 526).

Analysis

**{¶54}** At the outset of our analysis, we note that there is no indication in the record that the jury ever actually saw any photographs that the prosecutor had at counsel table. There is only defense counsel's indication that while the prosecutor was marking exhibits, the jury could possibly have seen a potentially inadmissible photograph. This mere possibility would not be sufficient to sustain a claim of prosecutorial misconduct.

**{¶55}** Nevertheless, even assuming that the jury did see a photograph, that it was inadmissible, and that it was "gruesome," we cannot find any prejudicial error here where the jury was instructed as to what evidence and exhibits to consider and the evidence was so strong against Miller. There is simply no indication here that the potential errant showing of a photograph was so prejudicial that it tainted the entire trial. Moreover, a specific instruction was given addressing this situation, remedying it. Therefore, Miller's argument is not well-taken.

Alleged Improper Statements in Closing
Arguments and Analysis

**{¶56}** Miller next argues that the prosecutor committed misconduct in closing arguments. Specifically, she contends that the State improperly indicated

that the jury could ignore Dr. Reardon's expert testimony at its discretion in the following segment of the State's closing argument.

> **Now, that testimony from Dr. Reardon is not for purposes of – of testifying to support a self-defense claim. You have to decide what relevance that testimony has; and as Judge Slagle has already explained to you, as an expert, you can ignore any part of an expert's testimony that you wish to.**

(Tr. at 885-886).

{¶57} While the prosecutor's statement here is perhaps carelessly worded, it is correct that the jury was free to believe or disbelieve the expert's testimony, and to determine what relevance it had to the trial. Thus we cannot find any prosecutorial misconduct here, even if it could have been better phrased.

{¶58} Regardless, the jury was instructed on what evidence to consider and the jury was specifically told multiple times that opening and closing arguments were not evidence. There is no indication here that the jury failed to abide by those instructions. For all of these reasons we can find no prosecutorial misconduct here that impacted the outcome of the trial.[3] Therefore, Miller's second assignment of error is overruled.

---

[3] In one sentence Miller argues that the prosecutor made improper statements in rebuttal closing argument by making a "striking" motion eighteen times to indicate the number of times Howard was hit. Miller does not cite to any authority as to how this is error, and we will not further address it.

*Third Assignment of Error*

**{¶59}** In Miller's third assignment of error, she argues that she received ineffective assistance of counsel. Specifically, she contends that defense counsel was deficient for failure to object to statements that the prosecutor made in closing arguments, and that defense counsel was deficient for failing to introduce Dr. Reardon's report into evidence.

Standard of Review

**{¶60}** To establish an ineffective assistance of counsel claim on appeal, Miller must show that trial counsel's performance was deficient and that counsel's deficient performance prejudiced her. *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley,* 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Purported Ineffective Assistance and Analysis

**{¶61}** We have already determined that any statements made by the prosecutor during closing argument did not impact the outcome of the trial. Thus after a thorough review of the closing arguments, we cannot find that defense

counsel was deficient for any failure to object. In any event, we could not find that any purported deficiency prejudiced Miller, therefore she could not establish either prong of ineffective assistance of counsel on this issue.

{¶62} As to Miller's claim that her counsel was deficient for failing to introduce Dr. Reardon's report into evidence, the State had filed a motion *in limine* seeking to limit Dr. Reardon's testimony and report prior to trial. Miller's counsel opposed this motion. The trial court granted the State's motion *in limine* in part, and overruled it in part. The trial court determined that Dr. Reardon's report rendered a number of opinions that appeared to be his conclusions as to what happened at the time of the homicide based on his assessment of Miller's credibility. The trial court found that this determination of credibility was not a matter for Dr. Reardon to opine about to the jury. Thus the trial court limited Dr. Reardon's testimony by restricting Dr. Reardon from testifying to such things as, "The veracity of the Defendant's account of the offense which led up to the death of Mr. Biederman." (Doc. No. 105). However, Dr. Reardon was permitted to testify to his diagnosis that Miller suffered from PTSD, and the results of various psychological tests.

{¶63} On appeal, Miller contends that her counsel was ineffective for failing to introduce Dr. Reardon's report into evidence, but the motion *in limine* limited what Miller could present from Dr. Reardon's report. Dr. Reardon's report

evidently contained material that the court found inadmissible. Miller's counsel argued against the State's motion *in limine*, and lost. We fail to see how there was any instance of ineffective assistance of counsel here given that defense counsel pushed to have more of Dr. Reardon's testimony introduced and was not permitted to do so. For all of these reasons, Miller's third assignment of error is overruled.

*Conclusion*

**{¶64}** For the foregoing reasons Miller's assignments of error are overruled and the judgment of the Marion County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and PRESTON, J.J., concur.**

**/jlr**