**[Cite as *State v. Fetherolf*, 2017-Ohio-1316.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

**STATE OF OHIO,**

      **PLAINTIFF-APPELLEE,**             **CASE NO. 14-16-10**

      **v.**

**MICHAEL JASON FETHEROLF,**         **O P I N I O N**

      **DEFENDANT-APPELLANT.**

---

**STATE OF OHIO,**

      **PLAINTIFF-APPELLEE,**             **CASE NO. 14-16-11**

      **v.**

**MICHAEL JASON FETHEROLF,**         **O P I N I O N**

      **DEFENDANT-APPELLANT.**

---

**Appeals from Union County Common Pleas Court**
**Trial Court No. 13-CR-0207**

**Judgments Affirmed**

**Date of Decision:   April 10, 2017**

---

**APPEARANCES:**

    *Carrie Wood* **for Appellant**

    *Terry L. Hord* **for Appellee**

Case Nos. 14-16-10, 14-16-11

**SHAW, J.**

{¶1} Defendant-appellant, Michael J. Fetherolf ("Fetherolf"), brings this appeal from the April 6, 2016, judgment of the Union County Common Pleas Court sentencing Fetherolf to serve 25 years to life in prison after Fetherolf was convicted in a jury trial of Rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, and Intimidation of a Witness in violation of R.C. 2921.04(B), a felony of the third degree.[1] On appeal, Fetherolf argues that the trial court erred by allowing multiple witnesses to testify to the veracity of statements made by the victim, A.C., that the trial court erred by failing to exclude details of Fetherolf's prior conviction since he did not testify at trial, that the trial court erred by allowing "other acts" evidence to be presented that had "no bearing on any fact of consequence," that the trial court erred by denying Fetherolf's motion for a new trial based on his claim that the State failed to disclose a conviction of one of the State's witnesses, and that the prosecutor committed misconduct that deprived Fetherolf of a fair trial.

*Facts and Procedural History*

{¶2} Fetherolf was originally indicted on November 19, 2013, for Rape with the specification that the victim was less than ten years of age in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, Gross Sexual Imposition in violation of R.C. 2907.05(B), a felony of the third degree, and Sexual Battery in violation of

---

[1] Fetherolf was also found guilty of Gross Sexual Imposition, but that count was merged with the Rape conviction for purposes of sentencing.

R.C. 2907.03(A)(5), a felony of the second degree.  It was alleged that on or about September 22, 2013, Fetherolf engaged in sexual conduct with his daughter, A.C., who was born in March of 2006.  According to the bill of particulars it was alleged that Fetherolf digitally penetrated A.C.'s vagina.

{¶3} On January 23, 2015, a superseding indictment was filed against Fetherolf.  The superseding indictment alleged 33 counts against Fetherolf, beginning with the same allegation of Rape previously indicted (Count 1) and the same allegation of Gross Sexual Imposition previously indicted (Count 2).  The superseding indictment then also alleged fifteen counts of Rape in violation of R.C. 2907.02(A)(1)(b), all felonies of the first degree (Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31), fifteen counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), all felonies of the third degree (Counts 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32), and one count of Intimidation of an Attorney, Victim or Witness in a Criminal Case in violation of R.C. 2921.04(B), a felony of the third degree (Count 33).  The new Rape and Gross Sexual Imposition charges were related to similar allegations of digital penetration that Fetherolf allegedly perpetrated against A.C. when Fetherolf had physical custody of A.C. on weekends between March of 2011 and September of 2013.  The Intimidation of a Witness charge alleged that Fetherolf threatened to spank A.C. if she told anyone about the

alleged incidents, and that she would be in trouble if she told anyone.  Fetherolf pled not guilty to the charges.

{¶4} On March 7-10, 2016, a jury trial was held.[2]  Testimony at trial indicated that A.C. was born in March of 2006 to mother Heather C., but it was not determined that Fetherolf was A.C.'s father until a DNA test was done when A.C. was approximately two and a half years old.  After Fetherolf was determined to be A.C.'s father, Heather testified that she contacted Fetherolf and asked if he wanted to be involved in A.C.'s life.  Fetherolf indicated that he did and Heather began providing Fetherolf with visitation.[3]  Heather testified that as time passed she started allowing overnight visits between A.C. and Fetherolf and that those overnight visits grew into every other weekend.

{¶5} Heather testified that on Friday September 20, 2013, she dropped A.C. off with Fetherolf for his weekend visitation with the intent being that Fetherolf or his grandmother would return A.C. on Sunday.  Testimony indicated that Fetherolf was staying in his grandmother's trailer at the time and that he primarily exercised his visitation with A.C. at the trailer.

{¶6} Heather indicated that she was contacted by Fetherolf on Saturday September 21st and Fetherolf asked her to drop off extra clothes for A.C., which she did.  Then, Heather testified that she received a text message from Fetherolf on

---

[2] A visiting judge presided over the trial.
[3] Heather testified that all visitation was established outside of court proceedings.

Sunday September 22, 2013, stating that his grandmother would bring A.C. home on Monday morning instead of Sunday. On Monday morning, Heather testified that she received a message from Fetherolf wherein he stated that he woke up late and that he or his grandmother would bring A.C. home that night or take her directly to school on Tuesday, September 24, 2013. Heather testified that she was upset with the situation.

**{¶7}** Heather indicated that the next morning, Tuesday, she received a call from the school inquiring about A.C. because she was not at school. Heather then began trying to contact Fetherolf. Heather testified that when she could not get in contact with Fetherolf, she called the police. The police located Fetherolf that day and facilitated A.C.'s return to Heather.

**{¶8}** After A.C. was returned to her, Heather took A.C. home. Heather commented that A.C. was dirty and looked like she needed a bath. Heather indicated that it was around lunchtime and A.C. was hungry so Heather made her food. Heather testified that A.C. looked "down" but was responsive. Heather testified that she asked A.C. about her weekend and eventually asked if A.C. got in trouble at Fetherolf's. Heather testified that A.C. put her head down, which was unusual behavior for A.C.

**{¶9}** Heather testified that A.C. asked to take her lunch upstairs to her room. Heather indicated that it was fine and permitted A.C. to go upstairs. Heather

testified that shortly thereafter, Heather's sister Kara went upstairs to talk to A.C. and a few minutes later Kara came down, "pale" with "a look of shock" and said that Heather needed to talk to A.C. (March 7, 2016, Tr. at 196).

{¶10} Heather testified that she then talked to her daughter and asked what was wrong repeatedly and Heather testified that A.C. initially told her that she did not want to say anything because she was afraid of being spanked or getting in trouble. Heather testified that she conveyed to A.C. that she was not going to get into trouble and that A.C. then told her that Fetherolf touched her "in her butterfly," and indicated her vagina. (*Id.* at 197). Heather testified that she asked A.C. what she meant and A.C. demonstrated with her hand.

> **She put her palm up. She took two fingers up and started going up and down like this on her palm and then she stuck one finger inside of her palm. And I asked her what she meant by that and she said that he had stuck a finger inside of her.**

(*Id.*) Heather testified that A.C. also told her that Fetherolf threatened to spank A.C. if A.C. did not allow him to touch her "butterfly." (March 7, 2016, Tr. at 197). Heather testified that A.C. indicated that similar acts had been going on since A.C. was between four and five years old. Kara, who had already talked to A.C. at that point, testified that A.C. had told her essentially the same story, that Fetherolf touched her in her "no-no" parts, indicating her vaginal area. (March 8, 2016, Tr. at 16).

-6-

{¶11} Heather testified that after hearing A.C.'s story she was upset and she went downstairs to make some phone calls. Kara took A.C. to a nearby park for 20-30 minutes while Heather made the calls. Heather testified that she called her mother, Linda, who came to the house. Linda also spoke with A.C. and Linda testified that A.C. revealed to her that Fetherolf had "stuck his fingers up in [her]" and that it had been going on since A.C. was four or five years old. (*Id*. at 43). According to Linda, A.C. also said that she did not tell anyone because her father had threatened to spank her if she did.[4]

{¶12} After Heather finished making phone calls to, *inter alia*, her pediatrician, A.C. was taken to a nearby hospital and referred to a separate hospital that could more adequately handle a sexual assault examination. A.C. was then taken to the emergency room at Nationwide Children's Hospital by Heather, Kara, and Kara's boyfriend.

{¶13} At the emergency room, A.C. met with a number of medical professionals including an emergency room physician and a Sexual Assault Nurse Examiner ("SANE"). A.C. also met with a social worker, Lauren Kato, who took A.C.'s initial history. A.C. informed the social worker and medical personnel that Fetherolf had been drinking and had "swirl[ed]" his fingers on her "bad spot."

---

[4] Fetherolf's attorney objected to testimony related to A.C.'s disclosures to Heather, Kara, and Linda. The trial court overruled these objections stating that they were, *inter alia*, excited utterances. Fetherolf does not claim on appeal that it was error for the trial court to permit these particular statements.

(March 8, 2016, Tr. at 109). Kato testified that A.C. indicated that Fetherolf threatened to spank A.C. if she did not cooperate. Kato testified that A.C.'s disclosure was consistent with what A.C. had told her mother based on Kato's interview with Heather.

{¶14} Shortly thereafter on the same date, A.C. was physically examined by Dr. Helen McManus, an emergency room physician. Dr. McManus testified that she used the initial history provided by Kato to direct her care. Dr. McManus testified that although she did not find any marks on A.C. the exam was consistent with an allegation of touching, which would often not leave any marks.[5] Dr. McManus testified that following her examination she concluded that A.C. had been sexually abused.

{¶15} In addition to a physical examination of A.C. by Dr. McManus, a rape kit was performed on A.C. by Teresa Warnimont, a SANE. Warnimont collected evidence and submitted it to BCI for testing. All swabs of A.C. checking for semen and amylase were negative. However, DNA testing revealed that in the crotch portion of A.C.'s underwear a male's DNA was present, which was consistent with a sample of Fetherolf's DNA.[6] The DNA analyst testified at trial that the DNA

---

[5] Dr. McManus noted in her report that "[i]n more than 90% of cases of documented sexual abuse the exam is normal." (State's Ex. 5 p. 4).

[6] "The partial Y-Chromosome DNA profile from the crotch and front panel of the underwear (Item 1.7.1A) is consistent with Michael Fetherolf." (State's Ex. 21). Further, the "estimated frequency 1 in every 4167 male individuals." (*Id.*)

present in A.C.'s underwear was more than what she would usually find with simply touching or handling underwear.

{¶16} A videotaped deposition of A.C. was played for the jury.[7] The deposition was dated May 18, 2015, which would have been approximately a year and a half after the alleged incidents of September 2013. During the deposition, A.C. often said she did not remember events. She even stated she could not remember the answers to some questions that she was asked that were totally unrelated to the events in question.[8] A.C. was tearful in the deposition and appeared reluctant to testify at all. At one point the deposition was stopped because A.C. was crying and she wanted to see her mother. When the deposition resumed, A.C. said she had gotten scared. In fact, on multiple occasions A.C. indicated that she was scared, and she stated that she did not want to talk about Fetherolf because she was scared. The one emphatic thing A.C. did testify to was that she did not want to see Fetherolf.[9]

{¶17} A.C. never did give an account of what Fetherolf had allegedly done to her in her deposition. When asked what occurred on the September 2013 weekend in question, she stated that she could not remember. However, when she

---

[7] The parties stipulated that A.C. was unavailable to testify at trial.

[8] At the beginning of the deposition, the judge presiding over the deposition indicated that he had found A.C. competent to testify.

[9] Through most of the deposition, A.C. was quiet and reluctant to say anything, answering most questions with some variation of "I can't remember." However, she was very definite in stating that she did not want to see Fetherolf. She was much louder and emphatic. Heather also testified that since the incident A.C. wanted nothing to do with her father.

was asked if she thought she had told people what had happened to her, she stated that she "thought so." Separately in the deposition she stated that she told her Aunt Kara "what [her] dad did," but she never defined what that was.

{¶18} Dennis Flanagan, a detective with the City of Marysville testified as to his involvement with this case. He testified that he tried to contact Fetherolf shortly after the accusations were made to get his side of the story and Fetherolf called Detective Flanagan one night just after midnight. Detective Flanagan testified that Fetherolf sounded irate and intoxicated. Detective Flanagan testified that Fetherolf called the allegations against him "bullshit" and stated that he would come in for an interview. Detective Flanagan testified that Fetherolf never came in and that Detective Flanagan was eventually contacted months later and informed that Fetherolf was apprehended elsewhere.

{¶19} The State also presented the testimony of Fetherolf's probation officer and a paramour of Fetherolf's, Pam Hawkins. Hawkins testified that she left her husband to be with Fetherolf in the fall of 2013, around the time these allegations surfaced. Hawkins testified that she thought Fetherolf was on felony probation for failure to pay child support[10] and that she and Fetherolf left Ohio together, at Fetherolf's suggestion, to go to New York and Pennsylvania. Hawkins testified that one evening while with Fetherolf she saw him looking at inappropriate pictures of

---

[10] Any child support related accusations were not regarding A.C. They involved another child or other children.

-10-

underage girls on a tablet. She also testified that Fetherolf purchased her a wig, thong and a skirt to dress her up like a "little girl." (March 8, 2016, Tr. at 137).

{¶20} Hawkins testified that things soured between her and Fetherolf and she turned herself in for an outstanding warrant. Hawkins testified that she went to jail and when she got out she alerted officers to Fetherolf's location. At that time, she believed he had an active warrant related to failure to pay child support.

{¶21} At the conclusion of the State's case, Fetherolf's counsel made a Crim.R. 29 motion for acquittal on all counts. The trial court sustained that motion with regard to 30 counts of the superseding indictment. Specifically, the trial court dismissed counts 3-32 of the superseding indictment on the basis that there was insufficient evidence to support convictions for Rape or GSI for any instances other than the September 2013 instance after which A.C. promptly disclosed what happened. The trial court indicated that the other allegations related to incidents that purportedly occurred between 2011 and 2013 were too indefinite and lacked sufficient proof to submit to the jury.

{¶22} The remaining three counts against Fetherolf, Rape, Gross Sexual Imposition, and Intimidation of a Witness related to the September 2013 incident, were then submitted to the jury. The jury ultimately found Fetherolf guilty of all three counts.

{¶23} Prior to Fetherolf's sentencing, he filed multiple *pro se* motions including a motion for a new trial, which alleged, *inter alia*, that the State failed to disclose some prior convictions of one of its witnesses, Pamela Hawkins. At Fetherolf's sentencing hearing, the trial court overruled Fetherolf's new trial motion, with the exception of his argument that the State failed to disclose some of the prior convictions of Hawkins. The trial court indicated that it would allow the State to respond in writing to Fetherolf's contention and that the trial court would rule on that issue related to Fetherolf's motion for a new trial after it received the State's response.

{¶24} As to Fetherolf's sentencing, the trial court merged Fetherolf's convictions for Rape and Gross Sexual Imposition, finding that they were allied offenses of similar import, and the State elected to proceed to sentence Fetherolf on the Rape conviction. The trial court then ordered Fetherolf to serve 25 years to life in prison on the Rape conviction, of which 25 years was a mandatory prison term. Fetherolf was sentenced to serve 30 months in prison on the Intimidation of a Witness conviction, concurrent to the Rape sentence.

{¶25} On April 6, 2016, a judgment entry memorializing Fetherolf's sentence was filed. Fetherolf filed a notice of appeal from that judgment.

{¶26} On April 21, 2016, the State filed a memorandum in opposition to Fetherolf's motion for a new trial based on the State allegedly failing to disclose

prior convictions of Hawkins. Fetherolf then filed a *pro se* response. On May 24, 2016, the trial court filed an entry denying Fetherolf's motion for a new trial. Fetherolf filed a notice of appeal from that judgment.

{¶27} Fetherolf's appeals from his sentencing entry and from the denial of his motion for a new trial were consolidated, and he asserts the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred when it allowed Dr. McManus, S.A.N.E. nurse Teresa Warnimont, and Caseworker Kaitlin Ruddy to testify to the veracity of A.C.'s statements.**

**Assignment of Error No. 2**
**The trial court erred when it failed to exclude: (1) details of Mr. Fetherolf's prior conviction and sentence when he did not testify at trial, and (2) other acts evidence which had no bearing on any fact of consequence in contravention of Evid.R. 404(B)[.]**

**Assignment of Error No. 3**
**The trial court erred when it denied Mr. Fetherolf a new trial after the State failed to turn over to defense counsel all of Pamela Hawkins' prior convictions, including a recent conviction for falsification.**

**Assignment of Error No. 4**
**Michael Fetherolf's right to a fair trial was violated by repeated instances of prosecutorial misconduct and deprived Mr. Fetherolf of a fair trial.**

*First Assignment of Error*

**{¶28}** In his first assignment of error, Fetherolf argues that the trial court erred by allowing several of the State's witnesses to provide testimony that he characterizes as vouching for the veracity of A.C.'s statements.

Standard of Review

**{¶29}** We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Lauf*, 3d Dist Putnam No. 12-16-06, 2017-Ohio-608, ¶ 54, citing *State v. Cassel*, 2d Dist. Montgomery No. 26708, 2016-Ohio-3479, ¶ 13, citing *State v. Graham,* 58 Ohio St.2d 350 (1979), and *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 19. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶30}** However, where Fetherolf did not object to an evidentiary issue, we review his arguments on appeal for plain error. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 69, *reconsideration denied*, 139 Ohio St.3d 1487, 2014-Ohio-3195, and *cert. denied*, 135 S.Ct. 959 (2015). We take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under plain error, Fetherolf must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial

clearly would have been otherwise. *Mammone* at ¶ 69, citing *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002).

Alleged Errors and Analysis

**{¶31}** On appeal, Fetherolf argues that several of the State's witnesses testified to their opinion of the veracity of A.C.'s statements. Specifically, Fetherolf contends that the emergency room physician, Dr. McManus, and the SANE, Teresa Warnimont testified that A.C. was credible and that such testimony was improper. Notably, Fetherolf acknowledges in his brief that he did not object to these purportedly erroneous statements at the trial court level, and thus we review their admissibility for plain error.

**{¶32}** It is apparent from a review of the record that Fetherolf mischaracterizes the testimony in the record on appeal. For instance, in his brief he contends that "[b]oth Dr. McManus and [the SANE] testif[ied] that, in their expert opinion, A.C. and her mother are credible." (Appt.'s Br. at 16). He also argues that Detective Flanagan and Kaitlyn Ruddy, an intake caseworker at the department of job and family services, testified that that A.C. was credible. These claims are simply inaccurate and do not reflect the testimony. There was testimony from some of these witnesses that A.C. and her mother were *consistent* in their statements, but these witnesses never testified specifically that A.C. was *credible*.

{¶33} Fetherolf seems to contend that because these witnesses testified that A.C.'s statements were consistent the witnesses were *effectively* testifying that A.C. was credible. Fetherolf seeks this Court to essentially make a ruling that a witness cannot testify that a statement is consistent because it implies that the statement is credible. However, a statement could be consistent and still be a complete fabrication. Whether a statement being consistent makes it more or less credible is a factual determination to be made by the finder-of-fact. Thus we do not find any of the witnesses' statements related to any consistency of A.C.'s disclosures to be error, let alone plain error.

{¶34} Nevertheless, Fetherolf does point us to one specific incident in the testimony of Teresa Warnimont, the SANE, wherein Warnimont arguably went beyond testifying that A.C.'s statements were consistent. That segment, cited by Fetherolf, reads as follows.

> **Q [Prosecutor]: We have just gone through, basically, what you did at Children's Hospital on September 24th of 2013 for the Rape kit. Right?**
>
> **A [Warnimont]: Yes.**
>
> **Q: When you are doing that work, do you specifically look for items of interest?**
>
> **A: Yes, we would look for any red marks or anything unusual on the patient's body.**

**Q: If, upon your examination, you do not see an indication of any type of injury or trauma to the vaginal area, does that rule out whether or not there's been sexual abuse?**

**A: No, it does not.**

**Q: Based on your training, experience and education, why is that?**

**A: The tissue in the ano-genital area is very vascularized, so it heals very easily. It, also, is very elastic, so it stretches easy. It is not uncommon to have no findings.**

**Q: Based on your training, education and experience, what have you learned about child disclosure in these type of cases?**

**A: That what they say happened is what happened and we treat them and give them the support that they need after the disclosure.**

**Q: That's how you handle them?**

**A: Correct.**

(March 9, 2016, Tr. at 33-34).

**{¶35}** Fetherolf argues that the preceding statement wherein the SANE testified that "what they say happened is what happened" constituted improper vouching for the victim's credibility. Contrary to Fetherolf's argument it seems that the SANE may have been merely saying that she "handled" the allegations for purposes of examination as though what the child said happened is what happened.

**{¶36}** However, to the extent that the SANE was testifying that *all* children, including A.C., are *always* telling the truth when they disclose, it would be an overly

broad and likely improper statement. Nevertheless, even assuming that the preceding testimony of the SANE was error and should not have been introduced, we cannot find that it was plain error in this instance.

{¶37} In this case the consistent statements of A.C. were corroborated by the DNA evidence. The jury was also able to see A.C.'s deposition and at least draw inferences from A.C.'s demeanor as to whether she may have been the victim of sexual abuse or not. We simply cannot find that even if we read the SANE's isolated statement in the worst possible light that it was so egregious that it rose to the level of plain error or that without the statement the outcome of the trial would have been different. Therefore, we do not find Fetherolf's arguments well-taken, and his first assignment of error is overruled.

*Second Assignment of Error*

{¶38} In Fetherolf's second assignment of error, he argues that the trial court erred by permitting "other acts" evidence that he contends had no bearing on any fact of consequence, and that the trial court erred by failing to exclude details of Fetherolf's prior conviction and sentence when he did not testify.

Standard of Review

{¶39} " 'The admission of * * * [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice.' "

*State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, quoting *State v. Diar,*

120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 66. Under an abuse of discretion review,

"[i]t is not sufficient for an appellate court to determine that a trial court abused its

discretion simply because the appellate court might not have reached the same

conclusion or is, itself, less persuaded by the trial court's reasoning process than by

the countervailing arguments." *Morris* at ¶ 14, citing *AAAA Ents., Inc. v. River*

*Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161 (1990). An

abuse of discretion standard is a deferential review. *Id*.

"Other Acts" Evidence

{¶40} The admission of "other acts" evidence is governed in part by Evid.R.

404(B), which reads,

> **(B) Other Crimes, Wrongs or Acts. Evidence of other crimes,
> wrongs, or acts is not admissible to prove the character of a
> person in order to show action in conformity therewith. It may,
> however, be admissible for other purposes, such as proof of
> motive, opportunity, intent, preparation, plan, knowledge,
> identity, or absence of mistake or accident. In criminal cases, the
> proponent of evidence to be offered under this rule shall provide
> reasonable notice in advance of trial, or during trial if the court
> excuses pretrial notice on good cause shown, of the general nature
> of any such evidence it intends to introduce at trial.**

{¶41} In this case, Fetherolf contends that the trial court erred by allowing

Pamela Hawkins, Fetherolf's former paramour, to testify regarding consensual

sexual acts that occurred between them, which were unrelated to the charged crimes,

thus constituting impermissible "other acts" evidence. In particular, Fetherolf argues that it was error to allow a portion of the following testimony.

**Q [Prosecutor]: When you were with [Fetherolf] during this time, did you see him on the computer?**

**A [Hawkins]: He was on my Tablet.**

**Q: Your Tablet?**

**A: Yes, and my cell phone.**

**Q: Did you see anything on your Tablet that concerned you?**

**[Defense Counsel]: Objection, Your Honor.**

**THE COURT: Overruled. I'm going to permit this witness to testify to certain matters that appear to be other acts that the defendant was allegedly involved in and I'm not going to permit this testimony to be introduced to prove the character of the defendant or he acted in conformity with character but it's being introduced for the sole purpose to prove his motive, his opportunity, his intent, his preparation, plan or knowledge or identity [sic].**

**So, it is only going to be used for that purpose, alone, and not to prove his character. Go ahead.**

**[Prosecutor]: Thank you, Your Honor.**

**Q: What was it that you saw on your Tablet?**

**A: Um, this was after we left Debbie and them's place. We went and stayed at a motel there in Marion and – this is hard for me to say –[Fetherolf] wanted to go to Wal-Mart for me to –**

**Q: Let's talk about – or are you talking about the Tablet now?**

**A: Yes.**

**Q:   Okay.**

**A:   [Fetherolf] was looking on the Tablet at some young girls. I'm not going to say they were – I'm going to say between 13 and younger.   Some, maybe, 15 and younger and it was some unappropriate (sic) pictures that nobody should be looking at and he just asked me what I thought it would be like to be with a young girl like that and I just, at the time, it didn't really register because I was, you know, drinking a lot at the time and it just didn't register how he was acting and how he was talking.**

**Q:   And then after that, did he – did you go somewhere?**

**A:   He wanted to go to Wal-Mart.  Um, he had some money sent to him by Western Union from his mother * * * and we were going to go and get a 24 pack of Busch beer and he started going over to where I was getting some potato chips and things and then I was walking around getting ready to go to the register and I looked over and he was over by the little girl's, teenage girl's clothing and I thought – I went over and asked him, what are you doing?  And he said, oh, I want to get – what size –**

**[Defense Counsel]:  Objection, Your Honor.**

**A:   – what size do you think –**

**THE COURT:  Okay, overruled.**

**Q:   Go ahead.**

**THE COURT:  Again, the same admonition.  It's not to prove character.  It's to prove the other things I already mentioned to you.  Go ahead.**

**A:   Sorry.  He wanted to know what size I would wear in thong underwear and asked me where the wigs would be at and I said, what are you talking about?  And he said, well, I want you to dress up as a little girl tonight for me.  Okay, you know, I didn't know what to think of that but he got a blonde wig, blue thong**

**underwear. Got me a strapless bra-shirt kind of thing and, like, a little mini skirt kind of thing and I wore it for him that night.**

**Q: Did this happen more than one time?**

**A: It happened three times.**

**Q: And, I mean, not that you went to the store but you wore it three different times?**

**A: I wore it twice. He wore it once.**

(March 8, 2016, Tr. at 135-137).[11]

{¶42} Fetherolf contends that the preceding testimony related to consensual sexual acts between himself and Hawkins, both adults, should have had no bearing on this Rape trial and that they were improperly admitted. He does not argue on appeal, as he did at the trial court level, that the testimony related to viewing inappropriate pictures of underage girls on the tablet was improperly admitted.

{¶43} In our analysis of the issue raised by Fetherolf, we emphasize that during Hawkins' testimony, the trial court interrupted to specifically admonish the jury, twice, to inform the jury that the testimony could only be used for the purposes specified in Evid.R. 404(B). Arguably the evidence does touch on some of the exceptions listed in Evid.R. 404(B), which permits testimony regarding certain other acts; however, it is undoubtedly prejudicial and it is our conclusion that any contention that it does fit under the 404(B) exceptions is tenuous at best.

---

[11] Notably, before Hawkins ever testified, the parties discussed her presumed testimony and its admissibility. The court heard arguments from both parties and ruled that the testimony was admissible.

**{¶44}** Nevertheless, the trial court is given broad discretion in these matters and we may not reverse simply because we may have made a different decision. Even assuming that it was error to allow the introduction of the consensual sexual acts we cannot find that such an error prejudiced Fetherolf given the evidence presented at trial, which has been previously referenced. Therefore, Fetherolf's argument is not well-taken.

Prior Conviction

**{¶45}** Next, Fetherolf contends that the trial court erred by allowing testimony that Fetherolf was on probation for an unrelated offense when he allegedly committed the crimes in this case.

**{¶46}** In this case, the fact that Fetherolf was on probation when he committed the Rape of A.C. in September of 2013 was first introduced through the testimony of Hawkins. Hawkins testified that during the fall of 2013, Fetherolf slept on the couch at the residence of Hawkins and her husband. Hawkins testified that she left her husband in the fall of 2013 to be with Fetherolf when Fetherolf suggested they go for a "change of scenery." (March 8, 2016, Tr. at 131).

**{¶47}** Hawkins testified that Fetherolf informed her that he was on probation for "felony child support" and that there was probably a warrant out for his arrest. (*Id*. at 132). Hawkins testified that she thought that was the reason Fetherolf wanted to get away. Hawkins testified that she and Fetherolf went to Catskill, New York,

then later to Pennsylvania to a motel, then to Marion, Ohio. Hawkins testified that at one point Fetherolf took the battery out of his cell phone because "they" were looking for him and they would not be able to locate where he was at.

{¶48} Hawkins testified that she was eventually pulled over by the police while driving alone and was arrested for an active warrant. Hawkins testified that she did jail time and when she got out she called the police on Fetherolf, thinking he had a warrant for felony child support. Hawkins testified that she learned at that time that he was also wanted for Rape.

{¶49} Later, Fetherolf's probation for an unrelated offense was mentioned again at trial when his probation officer, Edward Worley, testified. Worley testified that he was in charge of "felony non-support child support cases" and that Fetherolf was his probationer.

{¶50} During Worley's testimony, the trial court interrupted *sua sponte* and a sidebar conference was held. At that time, the trial court inquired as to the purpose of Worley's testimony and the trial court stated, without prompting by the defense that, "I never would have allowed him to testify in the first place about being on probation because now this felony conviction is evidence and he hasn't taken the stand and that's not proper." (March 9, 2016, Tr. at 60).

{¶51} When Worley's testimony resumed, he testified that he lost contact with Fetherolf at some point and that he tried to locate him. Worley testified that

Fetherolf was eventually apprehended and that Fetherolf admitted to his "violations" and the failure to pay his support. (*Id.* at 62). Worley then testified that on the day Fetherolf was arrested, he obtained Fetherolf's DNA, which was the standard used to test against the samples taken from A.C.

{¶52} On appeal, Fetherolf argues that it was error for the trial court to permit any testimony regarding Fetherolf's convictions when Fetherolf did not testify. Fetherolf contends that pursuant to Evid.R. 609(A)(2), evidence of a prior conviction of a defendant can be introduced, but only if the accused chooses to testify.

{¶53} In our own review, we would note that Fetherolf did not object to the preceding testimony. In fact, even after the trial court noted that it would not have allowed testimony related to probation, Fetherolf's trial counsel still did not object when Worley testified that Fetherolf admitted to violations of his child support.

{¶54} Even if we assumed that the testimony related to Fetherolf's prior conviction was not admissible, it can be argued that it was a valid trial strategy by the defense to allow in testimony that Fetherolf was on probation for a non-violent offense. Fetherolf essentially left the Marysville area right after the alleged incident with A.C. and without another valid reason to leave—such as running from child support—it could have appeared to the jury that Fetherolf was fleeing from a crime

against A.C. that he knew he had committed. Thus defense counsel may have wanted this testimony to be introduced for a valid purpose.

{¶55} Nevertheless, even if we presumed that Fetherolf did object and that the testimony was not admissible, we cannot find that the mentions of Fetherolf's probation and his felony child support so tainted the proceedings that his convictions must be reversed, particularly given that it had some arguable benefit to the defense. Moreover, the State's case was relatively strong insofar as statements of A.C. were actually corroborated in this case by the DNA evidence. Therefore, Fetherolf's argument is not well-taken, and his assignment of error is overruled.

*Third Assignment of Error*

{¶56} In Fetherolf's third assignment of error, he argues that the trial court erred by denying his motion for a new trial. Specifically, Fetherolf contends that the State committed discovery violations by failing to disclose Pamela Hawkins's 2015 misdemeanor conviction for falsification.

Standard of Review

{¶57} In order to reverse a defendant's conviction specifically due to a discovery violation, it must be shown that " '(1) the prosecution's failure to disclose was a willful violation of the rule; (2) foreknowledge of the information would have benefited the accused in preparing a defense, and (3) the accused * * * suffered prejudice.' " *State v. Wangler,* 3d Dist. Allen No. 1–11–18, 2012–Ohio–4878, ¶

108, quoting *State v. LaMar,* 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 38, citing *State v. Joseph,* 73 Ohio St.3d 450, 458 (1995).

**{¶58}** Generally, we apply an abuse of discretion standard to a trial court's decision to deny a motion for a new trial. *State v. Rice*, 11th Dist. Ashtabula No. 2012-A-0062, 2014-Ohio-4285, ¶ 9.

Fetherolf's New Trial Motion

**{¶59}** In this case, after the jury found Fetherolf guilty, but before his sentencing hearing, he filed a number of motions with the trial court, including a motion for a new trial. In the motion for a new trial, Fetherolf argued, *inter alia*, that the State committed a discovery violation by failing to disclose that Pamela Hawkins had a misdemeanor falsification conviction in 2015.

**{¶60}** The State responded to the motion by contending that it had provided all requisite discovery pursuant to Crim.R. 16. More specifically, the State contended that Fetherolf was provided an interview with Hawkins on June 25, 2014, and that Fetherolf was notified twice in 2015 that the State planned to call Hawkins as a witness. The State indicated that it provided known relevant convictions at that time.

**{¶61}** In addition, the State argued that during the course of the trial Hawkins readily testified to being on probation and that she had prior convictions, although a prior conviction specifically for falsification in 2015 was not mentioned by either

party. The State contended that it was unaware of a misdemeanor conviction for Hawkins occurring in 2015. Nevertheless, Hawkins did admit to being jailed on an unrelated charge.

**{¶62}** After reading the arguments of the parties, the trial court ultimately determined that Fetherolf "was not harmed by not having this information and the State was not responsible for not investigating the prior record more than it did." (Doc. No. 213).

Arguments and Analysis

**{¶63}** On appeal, Fetherolf renews his argument that the State failed to provide discovery, contending that the State should have known about the late 2015 misdemeanor conviction of Pamela Hawkins and that it should have disclosed the conviction. Fetherolf argues that Crim.R. 16(B)(2) actually required the State to disclose such information. Criminal Rule 16(B)(2) requires the State to disclose, "(2) Criminal records * * * of a witness in the state's case-in-chief * * *[.]"

**{¶64}** By contrast, the State argues that under the Supreme Court of Ohio's decision in *State v. Petro*, 148 Ohio St. 505 (1947), which discussed the granting or denial of a motion for a new trial based on newly discovered evidence, Fetherolf is unable to establish that he could not have discovered Hawkins's falsification

conviction in the exercise of due diligence, precluding his motion for a new trial.[12] Further the State argues that it was not required to investigate the criminal record of Hawkins all the way up to trial, and that the jury was apprised that Hawkins had prior convictions, if not this specific conviction.

{¶65} While the better practice may be for the State to continuously update the criminal records of its witnesses, we cannot find in this case the failure to do so was reversible error. This case was pending for years before it was brought to trial. The State indicated that it disclosed the relevant prior convictions that it was aware of before Hawkins was ever convicted of misdemeanor falsification in a nearby county. Here there is no indication that the State specifically tried to hide anything from the defense, particularly since the State actually elicited testimony from Hawkins that she went to jail and had other convictions.

{¶66} Finally, given that Hawkins's credibility was already called into question at trial by admitting that she had prior convictions, admitting that she had gone to jail, and admitting that she was drinking to the point of addiction during the time she spent with Fetherolf, we cannot find that this one additional conviction would have cast such additional doubt on her credibility that it impacted Fetherolf's

---

[12] Fetherolf argues in his reply brief that *Petro* does not apply in this instance because *Petro* relates to filing a motion for a new trial under Crim.R. 33(A)(6), and this case involves a motion for a new trial pursuant to Crim.R. 33(A)(2). Criminal Rule 33(A)(6) does specifically relate to newly discovered evidence where the defendant could not obtain it with reasonable diligence, and Criminal Rule 33(A)(2) relates to misconduct of, *inter alia*, the prosecuting attorney.

convictions. Therefore, for all of these reasons, Fetherolf's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶67}** In his fourth assignment of error, Fetherolf argues that the prosecutor committed misconduct that deprived him of a fair trial. Specifically, he contends that the prosecutor committed misconduct for eliciting the testimony he claims was erroneous in the first and second assignments of error and that the prosecutor committed misconduct by failing to disclose Hawkins's prior conviction for falsification referenced in the third assignment of error.

Standard of Review

**{¶68}** Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986). "In making this determination, an appellate

court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

Analysis

**{¶69}** Individually, we have found that none of the assigned errors by Fetherolf were reversible. In this assignment of error, he argues essentially that the prosecutor's cumulative actions render his convictions reversible. Given the evidence in this case, complete with DNA, and as noted earlier the jury's ability to at least observe and evaluate the victim's demeanor, even if she did not testify regarding the acts specifically, we cannot find that any errors we have found in this case cumulatively resulted in reversible error based on prosecutorial misconduct. This is particularly true given that defense counsel did not object to some of the testimony, possibly on the basis of trial strategy, and given that some of the testimony elicited was not objectionable at all. Thus we cannot find any prosecutorial misconduct in this case that rises to the level of prejudicial error, and Fetherolf's fourth assignment of error is overruled.

*Conclusion*

**{¶70}** For the foregoing reasons Fetherolf's assignments of error are overruled and the judgments of the Union County Common Pleas Court are affirmed.

***Judgments Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**